## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| RIPMAX LTD., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 07-CV-2133** |
| | ) | |
| HORIZON HOBBY, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#60) filed by Defendant, Horizon Hobby, Inc.  This court has carefully reviewed Defendants' Motion and supporting exhibits, the Response (#68) and supporting exhibits filed by Plaintiff, Ripmax, Ltd., and Defendant's Reply (#83) and supporting exhibits.  Following this careful and thorough review, Defendant's Motion for Summary Judgment (#60) is GRANTED in part and DENIED in part.

## BACKGROUND

On March 12, 2007, Plaintiff filed its Complaint (#1) against Defendant in the United States District Court for the District of Connecticut.  Plaintiff alleged that it is a United Kingdom company having a principal place of business at 241 Green Street, Enfield, United Kingdom.  Plaintiff alleged that Defendant is an Illinois corporation with its principal place of business at 4105 Fieldstone Road, Champaign, Illinois.  Plaintiff alleged that it is the owner of United States Patent No. 6,983,128 (the '128 patent), entitled "Radio Control Transmitter and Receiver," which was issued by the United States Patent and Trademark Office (PTO) on January 3, 2006 and assigned to Plaintiff.  Plaintiff alleged that Defendant has been and still is infringing one or more claims of the '128 patent by making, using, offering for sale and selling Spektrum DSM products.  Plaintiff sought a permanent injunction, damages and attorney's fees.  On May 14, 2007, Defendant filed its Answer, Affirmative

Defenses, and Counterclaim (#17).  In its Counterclaim, Defendant sought a declaratory judgment

that the claims of the '128 patent are invalid and are not infringed by Defendant.  Defendant also

asked that Plaintiff be enjoined from further charges of infringement or acts of enforcement based

on the '128 patent against Defendant or its actual or prospective customers, suppliers, and anyone

in privity with Defendant.  In addition, Defendant asked this court to award it its attorney fees in

defending this action. Plaintiff filed its Answer to Counterclaim (#19) on June 4, 2007.  On July 9,

2007, the district court in Connecticut granted Defendant's Motion to Transfer Venue.  On July 16,

2007, the case was transferred to this court.

On August 24, 2007, Magistrate Judge David G. Bernthal entered a lengthy Stipulated

Protective Order (#39) for the protection of confidential information in this case.  On September 12,

2007, Judge Bernthal entered a Discovery Order (#48).  The Order set deadlines for completing

discovery and set the case for a final pretrial conference for January 23, 2009, and a jury trial on

February 2, 2009.

On June 10, 2008, Defendant filed a Motion for Summary Judgment (#60) and supporting

exhibits.  Defendant argued that it is entitled to summary judgment because: (1) it did not infringe

the '128 patent; and (2) the '128 patent is invalid.  On August 1, 2008, Plaintiff filed a Memorandum

in Opposition to Defendant's Motion for Summary Judgment (#68) and supporting exhibits.

Because of the Protective Order, some of the exhibits were filed under seal (#69, #70, #71, #72).

On August 15, 2008, Defendant filed its Reply to Plaintiff's Response to the Motion for Summary

Judgment (#83) and supporting exhibits (#84), which were filed under seal because of the Protective

Order.

On September 23, 2008, Judge Bernthal entered an Order (#99) which granted Defendant's

Motion for Leave to File a First Amended Answer and Counterclaim. On September 26, 2008, Defendant filed a First Amended Answer, Defenses and Counterclaim (#100). Defendant added, as a defense, an allegation that the "claims of the '128 patent are unenforceable due to inequitable conduct by the inventor(s), the assignee, the prosecuting attorney(s) and/or some combination of them and others substantively involved in prosecution of the application leading to the '128 patent" before the PTO. Defendant alleged that, but for Plaintiff's intentional omissions of information, the PTO would never have issued the '128 patent. Defendant also added a Counterclaim for Declaratory Judgment seeking a declaration that the '128 patent is unenforceable due to Plaintiff's inequitable conduct.

On September 29, 2008, Defendant filed a Second Motion for Summary Judgment (#101). Defendant argued that it is entitled to summary judgment on the issue of non-infringement based on its contention that the '128 patent requires continuous control data and excludes burst mode control data. Defendant stated that this is a second and completely separate basis for requesting summary judgment of non-infringement and noted that this motion "in no way weakens or contradicts the compelling basis" of its first Motion for Summary Judgment. Defendant filed numerous lengthy exhibits in support of its Second Motion, some filed under seal (#102). Defendant also filed, under seal, a Motion for Summary Judgment on the issue of inequitable conduct, with attached exhibits (#103). Plaintiff has not responded to Defendant's newly filed Motions for Summary Judgment. This court will limit its consideration to the original Motion for Summary Judgment (#60).

This court notes that Judge Bernthal has been required to deal with ongoing discovery problems in this case. On September 30, 2008, Judge Bernthal entered an Order (#104) which denied Defendant's Motion to compel and motion for sanctions (#75). Judge Bernthal did, however,

direct Plaintiff to complete its discovery responses.  Defendant's Motion for Sanctions and Fees (#79) remains pending.

## ANALYSIS

### I.  MOTION TO FILE SURREPLY

On September 15, 2008, Plaintiff filed a Motion for Leave to File a Surreply to Defendant's Motion for Summary Judgment (#95).  Plaintiff argued that it took the deposition of Defendant's retained technical expert, Dr. Thomas Fuja, on August 13, 2008.  Plaintiff argued that, during this deposition, Dr. Fuja gave testimony that undermines Defendant's arguments regarding its Motion for Summary Judgment.  Plaintiff filed, under seal, a proposed Surreply and excerpts from the deposition of Dr. Fuja (#96).

On September 16, 2008, Defendant filed its Opposition to Plaintiff's Motion for Leave to File a Surreply (#97).  Defendant argued that Plaintiff has no basis for filing a surreply because the issues discussed during Dr. Fuja's deposition were previously discussed in Dr. Fuja's reports, which were provided to Plaintiff long before the August 1, 2008, due date for Plaintiff's Response to the Motion for Summary Judgment.  Defendant attached, under seal, excerpts from Dr. Fuja's Expert Witness Report and Rebuttal Expert Witness Report (#98).

This court has carefully considered Plaintiff's Motion, Defendant's Opposition and the attached exhibits.  Plaintiff has not convinced this court that Dr. Fuja's deposition testimony provides an adequate basis for allowing Plaintiff another opportunity to provide argument to this court.  This court notes that Rule 7.1(D) of the Local Rules of the Central District of Illinois does not provide for the filing of a surreply brief.  Moreover, "at some point, briefing must end." Archdiocese of Milwaukee v. Underwriters at Lloyd's, London, 955 F. Supp. 1066, 1070 (E.D. Wis.

1997); see also Brunker v. Schwan's Home Serv., Inc., 2006 WL 3827046, at *3 (N.D. Ind. 2006).

Accordingly, Plaintiff's Motion for Leave to File a Surreply (#95) is DENIED.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  A question of infringement that turns on a claim construction dispute may be resolved as a matter of law and on summary judgment.  Johnston v. IVAC Corp., 885 F.2d 1574, 1579-80 (Fed. Cir. 1989).  However, the court can resolve the issue on summary judgment only if "no reasonable jury could find that every limitation recited in the properly construed claim is or is not in the accused device." Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1376 (Fed. Cir. 2004).  "Stated another way, the absence from the accused product of one limitation in the claim means there is no literal infringement of that claim." Quickie Mfg. Corp. v. Libman Co., 2008 WL 630633, at *2 (C.D. Ill. 2008).

### III.  NON-INFRINGEMENT

The parties agree that the '128 patent relates to radio control transmitters and receivers for use in model airplanes, cars, boats, and the like by hobbyists.  Hobby-based airplanes are remotely operated by an individual on the ground using a radio transmitter to control the plane's operation. The transmitted signals control the various functions of the airplane, including the engine, wing position, and tail flaps, allowing for the remotely controlled flight of the plane.  The parties also agree that, in practice, hobbyists often gather in groups at airfields where each individual operates a remotely controlled airplane using radio system equipment that is similar to that being used by other hobbyists.  A risk therefore exists that transmitted control signals may be received by a receiver on another, unintended, plane and possibly trigger a crash of the plane, which can cause damage to the plane and also result in injury to individuals.  Therefore, it is imperative that each radio control model be operated on a separate frequency so as not to interfere with each other.  The '128 patent provides a solution to the problem of interference between two or more radio control systems being used simultaneously in relative proximity.

The Abstract of the '128 patent explains that, in the patented invention, a "radio control receiver is disclosed having data storage containing code unique to the receiver."  According to the Abstract, the receiver will scan through multiple channels, looking for a signal containing the correct receiver identifying code.  Upon identifying a signal containing the correct code, the receiver will lock onto that channel.  By preventing the transmitted signals from controlling more than one receiver, the approach taught by the '128 patent could reduce possible mishaps when more than one airplane is in operation.

The '128 patent has 15 claims, of which only claim 1 is independent.  All of the claims of

the '128 patent require "a receiver having data storage containing a code unique to the receiver."
Claim 1 states:

> 1. A radio control receiver for receiving, on one of a plurality of radio channels, receiver identifying code and control data in a periodically repeated time frame for operating a plurality of devices in a model in accordance with respective control data on each of a plurality of device channels included within said one radio channel, the receiver having data storage containing a code unique to the receiver, a tuner arranged to scan a plurality of radio channels, and a processor for processing receiver identifying code received on a scanned radio channel with the unique code to determine whether transmissions on the scanned radio channel are intended for the receiver, and said tuner being responsive to an output from the processor indicating either that transmissions on the scanned radio channel are intended for the receiver, for thus causing the tuner to lock onto said scanned radio channel, or that the transmissions on said scanned channel are not intended for the receiver, for thus causing the tuner to tune to another of the plurality of radio channels.

Defendant markets "Spektrum" products which have receivers that incorporate what Defendant refers to as "DSM" and "DSM2" technology. Defendant markets this technology on its webpage as "immune to all types of interference." The webpage also states that "[c]ollision avoidance eliminates the possibility of more than one . . . system from transmitting on the same

frequency."  The Spektrum products accomplish this by encoding their signals with their "own Globally Unique Identification number (called GUID) such that the receiver only recognizes the information from its specific transmitter."  Defendant's product manual describes the manner in which a Spektrum receiver is programmed to recognize the GUID of a single specific transmitter. The manual states: "[b]inding is the process of programming the receiver to recognize the GUID of a single specific transmitter.  Binding teaches the receiver the specific GUID of that transmitter, so that the receiver will only listen to the information from its previously bound transmitter and ignores everything else."  It is undisputed that, in the Spektrum system, receivers not programmed with the unique transmitter ID do not (and in fact cannot) respond to control signals from that transmitter. Christopher Huhn, Category Manager for all of the radio products at Defendant, testified at his deposition that, in Defendant's products, a receiver cannot function without being bound to a transmitter.  In his Declaration, dated June 5, 2008, Huhn stated that "no two transmitters have the same 'GUID'–*i.e.*, each is uniquely identified."  Huhn also stated:

> The Spektrum receivers, however, do <u>not</u> have a code unique to the receiver.  The receivers are initially free of any coding.  Before use, a receiver is programmed to operate with a specific transmitter–a process known as "binding."  In accordance with this programming arrangement, multiple Spektrum receivers can be "binded" to one Spektrum transmitter.  The binding process programs each receiver with the Spektrum transmitter GUID.  (Emphasis in original.)

Huhn also stated that, "[b]ecause the Spektrum products use Horizon's own proprietary system, there is no need for the receivers to have their own unique identifier code to prevent

miscommunications. The Spektrum products permit two or more receivers to have the same transmitter ID (emphasis in original)." Huhn stated that, "[w]ith this arrangement, the Spektrum transmitter controls two receivers at the same time with the same signals (emphasis in original)."

Some of the Spektrum products incorporate features that Defendant refers to as "Model Match." In a radio system with Model Match, a transmitter is capable of storing data for a number of different models, each in a separate "model memory" location in the transmitter. Defendant's product manual indicates that with Model Match technology, "[e]ach individual model memory has its own embedded code that is transferred to the receiver during binding." The manual also states:

> The receiver actually learns the code for the specific model memory that has been selected during binding and, when bound, will only operate when that model memory is selected. If a different (non-matching) model memory is selected, the receiver simply won't connect. This feature prevents trying to operate/fly a model using the wrong model memory. The receiver can be re-programmed to operate with any other model memory by simply re-binding with the transmitter programmed to the desired model memory.

In its Motion for Summary Judgment, Defendant argued that "the record conclusively demonstrates that Horizon's 'Spektrum' products operate in a manner that is diametrically opposite to that claimed in the '128 patent." Defendant contended that, specifically, "none of the accused products include the use of an 'identifier code' **unique** to the receiver (emphasis in original)." Defendant argued that the approach provided by the '128 patent requires that each receiver is given a unique identifier code, that is subsequently stored with the transmitter used for operating that

receiver.  Defendant contended that "[o]nce the transmitter is programmed with the receiver's unique identifier code, the transmitted control signals include this unique code and only that receiver will respond to the transmitted commands."  Defendant contended that, in its systems, radio control transmitters, not receivers, are assigned a unique ID called a "GUID."  Defendant argued that, by using this approach, "only one transmitter can control selectively programmed receivers; receivers not programmed for that unique transmitter do not (and in fact cannot) respond to control signals from that transmitter."  Defendant argued that, in contrast to the '128 patent, the Spektrum products permit two or more receivers to have the same transmitter ID.  Defendant contended that, with this arrangement, the Spektrum transmitter controls two receivers at the same time with the same signals, something that is an impossibility under the '128 patent.

In its Response, Plaintiff argued that Defendant's proposed construction of the claim term "code unique to the receiver" is incorrect as a matter of law.  Plaintiff contended that this court should reject Defendant's arguments that the claim term should be construed to be "an identifying number that solely identifies one and only one receiver," that "unique" is limited to mean that only one exists, and that to be unique to a receiver means that no two receivers have the same code. Plaintiff argued that Defendant's construction is improperly narrow and erroneous as a matter of law.  Plaintiff contended that the claim term "code unique to the receiver" is properly construed as "a code that identifies a receiver during operation."  Plaintiff argued that the '128 patent teaches that during operation it is important for the receiver to be able to identify its associated transmitter. Plaintiff argued that, as stated in the specification, the code on the receiver merely has to be "'unique' from any other code that is in use at that time to avoid interference."  Plaintiff relied, in part, on a dictionary definition of the word "unique" which defines the term as "limited in

10

occurrence to a given class, situation, or area."

The question of whether a device or product infringes a patent involves a two-step process: "first, the court determines the meaning of the disputed claim terms, then the accused device is compared to the claims as construed to determine infringement." Acumed LLC v. Stryker Corp., 483 F.3d 800, 804 (Fed. Cir. 2007). The first part of the analysis–the "construction" of the claim–is a question of law to be decided by the court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 388-91 (1996). The second step is a question of fact: whether each limitation of the claim is found in the accused product. Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1562 (Fed. Cir. 1990).

This court must therefore begin with the construction of the claim. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). In this case, it is undisputed that Claim 1 of the '128 patent is the only independent claim. Therefore, if Defendant's products do not infringe Claim 1, there is no need to consider the patent's other claims.

In construing a claim, the words of the claim "are generally given their ordinary and customary meaning." Phillips, 415 F.3d at 1312, quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). However, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313. In this case, the patent application was filed on October 8, 2002. Plaintiff has pointed out that its technical expert, Dr. Kourosh Parsa, stated in his Rebuttal Expert Witness Report that "[a] person of ordinary skill in the art would be [a radio frequency] technician having an associate's or

bachelor's degree in electronics engineering technology and around five years experience in [radio frequency] transmission systems for remote control models."[1]

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Phillips, 415 F.3d at 1313. "That starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Phillips, 415 F.3d at 1313. It is important to recognize that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313. The court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Phillips, 415 F.3d at 1314, quoting Innova/Pure Water, Inc. v. Safari Walter Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004). Those sources to be consulted include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Phillips, 415 F.3d at 1314, quoting Innova, 381 F.3d at 1116.

Quite apart from the written description and the prosecution history, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314. For example, "the context in which a term is used in the asserted claim can be highly

---

[1] Defendant has similarly stated that the "level of skill in the art is a detailed understanding of electronics and radio frequency transmitters and receivers used for control and/or communications" which "can be gained by formal education including undergraduate and/or advanced degrees in electrical engineering, physics or similar fields, or work experience in a field applying transmitter/receiver technology for more than five years."

instructive." Phillips, 415 F.3d at 1314.  In addition, because the claims are part of "a fully integrated written instrument," consisting principally of a specification that concludes with the claims, claims "must be read in view of the specification, of which they are a part." Phillips, 415 F.3d at 1315, quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315, quoting Vitronics, 90 F.3d at 1582.

In addition to consulting the specification, a court "should also consider the patent's prosecution history, if it is in evidence." Phillips, 415 F.3d at 1317, quoting Markman, 52 F.3d at 980.  The claims, specification, and prosecution history of a patent make up the "intrinsic evidence" to which a court should look first when construing claims.  Vitronics, 90 F.3d at 1582; see also Phillips, 415 F.3d at 1317.  Intrinsic sources are the most relevant.  Microprocessor Enhancement Corp. v. Tex. Instruments, Inc., 520 F.3d 1367, 1378 (Fed. Cir. 2008).  Courts may also consider extrinsic evidence which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Phillips, 415 F.3d at 1317, quoting Markman, 52 F.3d at 980.  However, extrinsic evidence, in general, is less reliable than the patent and its prosecution history in determining how to read claim terms.  Phillips, 415 F.3d at 1318.

Defendant has contended that claim 1 of the '128 patent must be construed as requiring an "identifier code" unique to the receiver, meaning that only one receiver may have that code. Defendant argued that the specification included in the '128 patent describes the essence of the invention as requiring first and foremost a receiver unique code by stating "[a]gainst this background

13

the invention provides a radio control receiver for operating a plurality of devices each on a respective device channel, the receiver having data storage containing code unique to the receiver . . . ." Defendant also argued that, in the specification, the "comparison of the stored receiver unique code with the unique code received periodically in the transmitted signal from the transmitter is described in the '128 patent, clearly limiting the receiver stored value to an identifier unique to that receiver." In addition, Defendant pointed out that one of the diagrams included as part of the specification shows that the receiver unique code is permanently stored in data storage 12 and accessed in a unidirectional read operation (shown by a one-way arrow) by the processor 10 so that it can be compared with the identifying code read from the received control signals collected by antennae 4, via tuner 8. Defendant argued that, as taught with this arrangement, if a match exists in processor 10, the received control signals are used to operate the devices connected to the receiver. Defendant also pointed out that another diagram shows that the '128 patent does not specify a unique identifier for the transmitter. Defendant argued that, based upon the specification, "the approach provided by the '128 patent requires that each receiver is given a unique identifier code, that is subsequently stored with the transmitter used for operating that receiver."

Defendant also attached a copy of an amendment sent to the examiner in the PTO on behalf of the inventor of the '128 patent, Elliot Wright. Defendant stated that the U.S. examiner initially concluded that the '128 patent was not novel and was in fact fully disclosed in an earlier patent, U.S. Patent 5,896,094 issued to Narisada, which related to a remote keyless entry system for a car that uses a radio transmitter and receiver to open a car door lock remotely. According to Defendant, the examiner pointed out that the Narisada patent included a unique code associated with the transmitter for assuring that only those specific locks storing the transmitter unique code will be

14

unlocked by the transmitted signals.  In responding to the examiner, the patentee amended the claim and distinguished the use of a "preset" code unique to the transmitter in the keyless system disclosed in the Narisada patent, stating:

> None of this is addressed by Narisada.  The reference is concerned with a keyless entry system.  In such systems, the channel is preset and cannot be altered in order to avoid repeated use of the same channel.  Indeed, plural use is permissible, transmissions on the same channel being distinguished by their ID code.  In the invention, reception by plural receivers on the same channel is not distinguished but avoided.

Defendant also relied on extrinsic evidence in support of its construction of claim 1.  Defendant provided excerpts from the deposition transcripts of Nicholas Moss, the Manager Director of Plaintiff, and Colin Straus, a Director of Plaintiff.  Moss testified that he understood that the receiver under the patent has a unique code and "no other receiver can have that code."  Moss testified that the idea of the word "unique" is "that there aren't two with the same number."  At his deposition, Straus testified that, in telling Moss why he believed a supplier's new product infringed the '128 patent, he "explained that the receiver had a unique serial code and that the transmitter had to be set to this serial code."

As noted, Plaintiff has argued that Defendant's construction of claim 1 of the '128 patent is improperly narrow and incorrect as a matter of law.  Plaintiff conceded that the specification is important in discerning the proper meaning of terms used in the claims, but argued that "it is improper to import limitations from the specification into the claims," citing Phillips, 415 F.3d at

15

1323.  Plaintiff argued that the Federal Circuit has repeatedly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.  Plaintiff argued that, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intent to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004), quoting Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002).

Plaintiff argued that, in fact, the specification included in the patent does not expressly define the term "unique" or limit the code to a number.  Plaintiff further argued that Moss's deposition testimony does not support Defendant's incorrect claim construction because Moss "was careful to explain that he had only a broad, superficial understanding of the subject matter of the '128 patent" and was asked to comment on the embodiment of the invention disclosed in the specification rather than what claim 1 of the '128 patent covers.  Plaintiff also argued that Defendant was "improperly attempting to rely on extrinsic evidence for an understanding of this claim term rather than intrinsic evidence."

Plaintiff argued that, based upon the specification, the code on the receiver merely has to be "unique" from any other code that is in use at that time to avoid interference.  Plaintiff argued that a proper reading of the '128 patent:

> teaches that during operation it is important for the receiver to be able
>
> to identify its associated transmitter.  This is accomplished by use of
>
> a "unique" code that is saved on both the transmitter and the receiver
>
> such that, during operation, the receiver can correctly identify the

16

signal sent from its corresponding transmitter.  The "code unique to the receiver" is used by the receiver to identify its associated transmitter from any other transmitter that may be in operation at the time.

 Plaintiff argued that this interpretation is further supported by extrinsic evidence.  Plaintiff provided a copy of a printout from Dictionary.com.  The printout provided the following definitions of the word "unique":

–adjective

1.    existing as the only one or as the sole example; single, solitary in type or characteristics: *a unique copy of an ancient manuscript.*

2.    having no like or equal; unparalleled; incomparable: *Bach was unique in his handling of counterpoint.*

3.    limited in occurrence to a given class, situation, or area: *a species unique to Australia.*

4.    limited to a single outcome or result; without alternative possibilities: *Certain types of problems have unique solutions.*

5.    not typical; unusual: *She has a very unique smile.*

–noun

6.    the embodiment of unique characteristics; the only specimen

of a given kind: *The unique is also the improbable.*[2]

Plaintiff also provided a copy of the Expert Witness Report of Kourosh Parsa, Ph.D.  In his report, Dr. Parsa stated:

> As I understand the function and operation of the DSM and DSM2 products, the GUID is originally stored on the transmitter and is written to or "bound" with the receiver during the binding process. The same code may be written to multiple receivers, *i.e.* a single transmitter may be bound to multiple receivers so that each of the receivers stores the same code.  It could be argued that when this situation occurs, the code saved in a receiver's memory is not "unique" because that same code is also stored in other receivers' memories.  However, based upon my experience in the radio communication industry, my reading of the '128 patent and other materials in this case, my understanding of the term "unique" in this context is: the code is unique to a receiver during operation.
>
> . . .
>
> This interpretation is further supported by the dictionary definition of the word "unique."  Dictionary.com defines the term "unique" as follows: "limited in occurrence to a given class, situation, or area." . . . In my opinion, this is the correct definition in this

---

[2]  This court notes that its copy of Webster's New College Dictionary (1995) provides the following three definitions for "unique": "Being the only one of its kind: Sole," "Being without equal or rival," and "Unusual."

18

context. The receiver must have a code that is unique among all other receivers in operation so as to allow the receiver to lock onto the transmitted signal. That there may be another model in the modeler's closet that has the same code is irrelevant because, during operation, the code is "unique" among all other codes that may be in use by other models in operation at that time.

In its Reply, Defendant argued that Plaintiff's proposed construction lacks support in the intrinsic record. Defendant contended that "unique" means "one" or "sole" based on the patent specification and file history and is "precisely how a skilled worker in this field would understand this claim." Defendant pointed out that Plaintiff's proposed "during operation" language does not appear within claim 1. Defendant argued that Plaintiff "invented this language in light of the accused products." Defendant further pointed out that a patent claim may be directed to an "apparatus" or a "method" of use, but not both. See Microprocessor Enhancement Corp., 520 F.3d at 1374. Defendant argued that, because claim 1 is an apparatus claim regarding "a receiver," Plaintiff's attempt to limit "unique" to "during operation" would in essence import a method step. Defendant also pointed out that Plaintiff skipped the first two definitions of "unique" found on Dictionary.com. Defendant argued that the first two definitions support Defendant's construction and are more appropriate in this context because they are more quantitative and exacting as demanded by an engineering discipline. Defendant argued that Plaintiff's construction improperly broadens "receiver" so that the claim covers "code unique to a receiver or transmitter." Defendant argued that Plaintiff chose not to draft a claim to cover transmitter unique code.

Defendant attached excerpts from the deposition transcript of Elliott Wright, the inventor of

19

the '128 patent.[3]  At his deposition, Wright testified that he purposely chose receiver unique codes.

He stated that "[t]he way this patent or this idea evolved or the way I thought of it was that a

receiver would have a unique ID number serial number and unique code."  He also explained:

> [T]here were two ways to achieve this.  You could set a unique code
> in the transmitter or the receiver.  You would then effectively pair the
> other device with that same code.  The reason we put it in, we said
> that the receiver would have a unique code, was so that on
> computerized radio control systems you had lots of what we call
> model memories.  You can program in the configuration of a
> particular model into the radio control system and you could set up
> a radio control system to operate five or six different models, so you
> could have them at the same time, different times, and you would
> select the particular model memory.  The reason we said the receiver
> would be unique and supply the uniqueness was so that if you had
> lots of different models you would turn your transmitter on, you
> would select your model helicopter 1, and you would then turn the
> helicopter on and it would then operate it.

Defendant also provided correspondence written by Wright around the time of the invention in

which he characterized his invention as relating "to serial number coding receivers so that an RC

transmitter has to transmit the receiver's serial number before the receiver will accept a signal from

---

[3]  This deposition was taken on July 23, 2008, more than a month after Defendant filed its
Motion for Summary Judgment.

the transmitter" and in which he stated that a "unique serial number will be fixed in the chip of each receiver."

In construing a patent claim, "[u]ltimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelope with the claim." Phillips, 415 F.3d at 1316, quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316, quoting Renishaw, 158 F.3d at 1250. Moreover, the court in Phillips provided a lengthy discussion regarding how much weight should be given to a dictionary definition in determining the meaning of a term included in a patent claim. Phillips, 415 F.3d at 1320-22. The court stated that the main problem with elevating the dictionary to prominence "is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." Phillips, 415 F.3d at 1321. The court stated that "there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words." Phillips, 415 F.3d at 1321. Therefore, the court should focus "at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down." Phillips, 415 F.3d at 1321. In fact, "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." Phillips, 415 F.3d at 1322.

In this case, this court has carefully read claim 1, the specification included in the patent and the prosecution history provided by Defendant. Following this careful consideration, this court

21

agrees with Defendant that claim 1 of the '128 patent must be construed as requiring an "identifier code" unique to the receiver, meaning that only one receiver may have that code. This court concludes that this is the meaning the term "unique" would have to a person of ordinary skill in the art in question at the time of the invention. This court concludes that this construction is entirely consistent with the language included in claim 1, the specification included in the '128 patent, and the prosecution history. This court further concludes that this construction is the correct construction because it stays true to the claim language and most naturally aligns with the patent's description of the invention. See Phillips, 415 F.3d at 1316.

This court also notes that Defendant has provided extrinsic evidence which supports this construction. While this evidence is not as important as the intrinsic evidence in determining the proper construction of the claim, this court concludes that the deposition testimony of Moss, Straus and Wright certainly supports this court's construction. This court finds the deposition testimony and writings of Wright, the inventor of the '128 patent, particularly instructive. Wright made clear that he purposely chose a receiver unique code which required a "unique serial number."

This court concludes that accepting Plaintiff's construction of claim 1 would require this court to write language into the claim that is not there. This court agrees with Defendant that claim 1 is an apparatus claim so that construing the claim to mean that the code only has to be unique to the receiver "during operation" would improperly import a method step into the claim. Furthermore, this court finds unpersuasive Plaintiff's reliance on a dictionary definition in support of its construction of claim 1. Plaintiff has relied on the third listed definition of the word "unique" found in a list of definitions on a website. This court concludes that this extrinsic evidence is entitled to little weight. This court concludes that it is better to focus its inquiry on the meaning of the term

22

"unique" within the context of the patent rather than on one of the abstract meanings of the term listed on a website.  See Phillips, 415 F.3d at 1321.  This court agrees with the court in Phillips that "there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words." Phillips, 415 F.3d at 1321.  This court further notes that, in fact, the first two definitions listed on the website, as well as the definition provided by Websters, are entirely consistent with this court's construction of the term "unique" in claim 1 of the '128 patent.

Since this court has construed claim 1 of the '128 patent, the next question before the court is whether each limitation of claim 1 is found in the accused products.  This second step is a question of fact.  See Hormone Research Found., Inc., 904 F.2d at 1562.  Therefore, this court must determine whether there is any genuine issue of material fact regarding whether Defendant's products infringe the patent, as construed.  Defendant has provided evidence that its products have a code unique to the transmitter and that more than one receiver may be bound to that unique code.  Defendant has provided the Declaration of Christopher Huhn which stated that the "Spektrum transmitter controls two receivers at the same time with the same signal (emphasis in original)."  Defendant also provided the Declaration of Stephen Rojecki, a user of Spektrum products since 2005.  Rojecki stated that "users of large model airplanes frequently install more than one receiver in the same model plane" and that the multiple receivers "receive the same signal and act as a backup on each other."  Rojecki also stated that he had "installed more than one Horizon Spektrum receiver in several of [his] model airplanes" and had "bound as many as four receivers to the same transmitter." Rojecki stated that he had provided Defendant with photographs of the inside of two of his model airplanes in which he had installed two Spektrum AR 7000 7 channel receivers.  Rojecki stated that

the photographs showed two receivers bound to the same transmitter with the same transmitter GUID. The photographs were attached to Rojecki's Declaration. Defendant also relied on Dr. Fuja's Rebuttal Expert Witness Report in which he stated that a large percentage of Spektrum products are sold with a "DualLink" feature, having two identically coded receivers both bound to the same transmitter. This evidence shows that Defendant's products do not contain an "identifier code" unique to the receiver, meaning that only one receiver may have that code. Therefore, Defendant's products do not infringe the '128 patent as this court has construed it.

Plaintiff has argued that this court should not accept as true Defendant's assertion that the GUID code on the transmitter may be written to multiple receivers. Plaintiff has not presented this court with any contrary evidence, however. In fact, Plaintiff's expert, Dr. Parsa, accepted this as true in his Rebuttal Expert Witness Report. This court therefore concludes that Plaintiff has not shown that a genuine issue of material fact exists on this point.

Plaintiff argued, however, that at the very least there is a genuine issue of material fact regarding whether Defendant's products with "Model Match" infringe the '128 patent. Plaintiff contends that, for the Spektrum products that use the model match feature, the code that is written to the receiver is a combination of the transmitter's GUID and the particular model memory location. Therefore, Plaintiff argues that the code written to the receiver is not only different from any other code that may be in operation, but is also absolutely different from any other code written to any other receiver.

In its Reply, Defendant stated that the "Model Match" feature is available in all DSM2 air radios and at least one surface transmitter. Defendant stated that, in "Model Match," the GUID is combined with a memory location to form a "model-specific-GUID." However, the model-specific-

24

GUID functions just like a GUID–a transmitter specific unique code that can be stored in more than one receiver.  Defendant further stated that the DSM2 receivers with model match also have DualLink technology.  Therefore, based upon the evidence presented to this court, the model-specific-GUID is stored on two receivers inside the same model.  This court agrees with Defendant that its products with "Model Match" do not have an "identifier code" unique to the receiver, meaning that only one receiver may have that code.

For all of the reasons stated, this court concludes that Defendant has shown that a limitation of claim 1, the requirement of an "identifier code" unique to the receiver, meaning that only one receiver may have that code, is absent from Defendant's products so there is no literal infringement of the '128 patent.  This court thus concludes that "no reasonable jury could find that every limitation recited in the properly construed claim is . . . in the accused device."  See Frank's Casing Crew & Rental Tools, Inc., 389 F.3d at 1376.  Defendant has shown that its products do not infringe the '128 patent, as properly construed.  Accordingly, Defendant is entitled to summary judgment in its favor on Plaintiff's Complaint alleging infringement of the '128 patent and on Count I of Defendant's First Amended Counterclaim which alleges non-infringement.

## IV.  INVALIDITY

"A patent shall be presumed valid."  35 U.S.C. § 282.  However, a patent is invalid for anticipation if a single prior art reference discloses each and every limitation of the claimed invention.  Schering Corp. v. Geneva Pharms., Inc., 339 F.3d 1373, 1377 (Fed. Cir. 2003).  The determination of whether a reference includes all the limitations of a claim and, therefore, anticipates a claim is a question of fact.  Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 995 (Fed. Cir. 2006).  The presumption of validity enjoyed by every patent requires that the party challenging

validity must prove facts establishing invalidity by clear and convincing evidence.  See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.3d 1350, 1359-60 (Fed. Cir. 1984).

In its Motion for Summary Judgment, Defendant argued that the '128 patent is invalid as a matter of law because the alleged claimed invention is not novel as it was fully disclosed earlier in a published German patent, DE 839.  Defendant stated that Plaintiff first filed a patent application in the United Kingdom and then filed an International patent application.  According to Defendant, the European examiner issued a Preliminary Search Report in which the examiner concluded that the alleged invention of the '128 patent was not novel because it had been disclosed in a published German reference, DE 839, years earlier.  Defendant contended that "it is clear that the U.S. examiner never saw the Preliminary Search Report or the German reference during his review of the '128 patent and its claims."  Defendant argued that DE 839 fully teaches each of the claim elements in the '128 patent and that Plaintiff did not correct the U.S. examiner's oversight of the DE 839 reference.  Defendant argued that, although every patent is presumed valid, the presumption of validity is much diminished where the prior art was not mentioned in the patent's prosecution. Defendant, however, did not include facts regarding Plaintiff's patent applications in its Undisputed Material Facts and has not provided this court with any documents or affidavits which support its assertions regarding Plaintiff's actions in obtaining the '128 patent.  Defendant has only provided the amendment sent to the U.S. examiner on behalf of the inventor of the '128 patent, Elliot Wright, which contested the U.S. examiner's initial conclusion that the '128 patent was fully disclosed in an earlier patent issued to Narisada.

In its Response, Plaintiff contended that Defendant has not shown by clear and convincing evidence that claim 1 is anticipated by DE 839.  Plaintiff also argued that Defendant has not shown

that the presumption of validity is diminished in this case or that its expansive reading of what is disclosed by DE 839 is correct.  Plaintiff argued that the prior art reference does not disclose each and every element of claim 1, including the claim limitations listed in the preamble of the claim. Plaintiff further contended that there are numerous disputed facts regarding the disclosure of DE 839 so that Defendant is not entitled to summary judgment on the validity of the '128 patent.

This court agrees with Plaintiff that Defendant has not provided "clear and convincing" evidence of the invalidity of the '128 patent.  This court therefore concludes that Defendant's Motion for Summary Judgment on the issue of validity must be denied at this time.  Moreover, Defendant's new Counterclaim which alleges that the '128 patent is unenforceable due to inequitable conduct was recently filed.  Therefore, the issues of validity and enforceability of the '128 patent remain pending.[4]     IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion to File Surreply (#95) is DENIED.

(2)  Defendant's Motion for Summary Judgment (#60) is GRANTED in part and DENIED in part.

(3) Defendant's Motion (#60) is GRANTED on the issue of non-infringement.  Accordingly, judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's Complaint (#1) and on Defendant's First Amended Counterclaim (#100) as to Defendant's request for a declaration that the claims of the '128 patent are not infringed by Defendant.

(4) Defendant's Motion (#60) is DENIED on the issue of invalidity.  Defendant's claim that the '128 patent is invalid remains pending.  In addition, Defendant's claim that the '128 patent is

---

[4]  This court does note that Defendant has filed a new Motion for Summary Judgment, with extensive documentation, on the issue of enforceability.

unenforceable due to inequitable conduct and Defendant's request for injunctive relief and attorney's fees, which are included in Defendant's First Amended Counterclaim (#100), remain pending.

(5) Defendant's Motion for Sanctions and Fees (#79) also remains pending.

(6) This case remains scheduled for a final pretrial conference on January 23, 2009, and a jury trial on February 2, 2009.

(7) This case is referred to Judge Bernthal for further proceedings.

ENTERED this 7th day of October, 2008

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE