## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **RIPMAX LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 07-CV-2133** |
| | ) | |
| **HORIZON HOBBY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the motions pending in this case. This court has carefully reviewed the arguments of the parties and the documents filed by the parties. Following this careful and thorough review, this court rules as follows: (1) the Motion for Summary Judgment of Inequitable Conduct (#103) filed by Defendant, Horizon Hobby, Inc. (Horizon) IS DENIED; (2) the Cross Motion for Summary Judgment of No Inequitable Conduct (#109) filed by Plaintiff, Ripmax Ltd. (Ripmax) is GRANTED; (3) Horizon's Motion in Limine to Alter Order of Proofs (#123) is GRANTED; (4) Horizon's Motion in Limine to Preclude Evidence of Infringement, Damages, and Secondary Considerations of Nonobviousness based on Horizon's Products (#124) is GRANTED; (5) Ripmax's Motion in Limine Precluding Horizon's Use of Translations to Prove Inequitable Conduct (#126) is MOOT; (6) Ripmax's Motion in Limine Precluding Use of the Futaba Drivelink Manuals as Prior Art to the '128 Patent (#127) is DENIED; (7) Ripmax's Motion in Limine to Exclude Trial Exhibits 578 and 648 from the Jury (#140) is GRANTED; (8) Ripmax's Motion to Preclude Testimony by Thomas Fuja, Ph.D. Regarding Patent Prosecution Practice and Patent Office Procedure (#141) is MOOT; (9) Ripmax's Motion in Limine for Bench Trial on Issues of Unenforceability and Inequitable Conduct (#142) is MOOT; and (10) Horizon's Motion for Leave to Amend the Scheduling Order (#143) is MOOT. Horizon's Second Motion for Summary

Judgment of Non-infringement (#101) remains pending.

BACKGROUND

On March 12, 2007, Ripmax filed its Complaint (#1) against Horizon in the United States District Court for the District of Connecticut. Ripmax alleged that it is a United Kingdom company having a principal place of business at 241 Green Street, Enfield, United Kingdom (UK). Ripmax alleged that Horizon is an Illinois corporation with its principal place of business at 4105 Fieldstone Road, Champaign, Illinois. Ripmax alleged that it is the owner of United States Patent No. 6,983,128 (the '128 patent), entitled "Radio Control Transmitter and Receiver," which was issued by the United States Patent and Trademark Office (PTO) on January 3, 2006 and assigned to Ripmax. Ripmax alleged that Horizon has been and still is infringing one or more claims of the '128 patent by making, using, offering for sale and selling Spektrum DSM products. Ripmax sought a permanent injunction, damages and attorney's fees. On May 14, 2007, Horizon filed its Answer, Affirmative Defenses, and Counterclaim (#17). In its Counterclaim, Horizon sought a declaratory judgment that the claims of the '128 patent are invalid and are not infringed by Horizon. Horizon also asked that Ripmax be enjoined from further charges of infringement or acts of enforcement based on the '128 patent against Horizon or its actual or prospective customers, suppliers, and anyone in privity with Horizon. In addition, Horizon asked this court to award it its attorney fees in defending this action. Ripmax filed its Answer to Counterclaim (#19) on June 4, 2007. On July 9, 2007, the district court in Connecticut granted Horizon's Motion to Transfer Venue. On July 16, 2007, the case was transferred to this court.

On June 10, 2008, Horizon filed a Motion for Summary Judgment (#60) and supporting exhibits. Horizon argued that it was entitled to summary judgment because: (1) it did not infringe

the '128 patent; and (2) the '128 patent is invalid.  On September 23, 2008, while the Motion for Summary Judgment was pending, Magistrate Judge David G. Bernthal entered an Order (#99).  Judge Bernthal granted Horizon's Motion for Leave to File a First Amended Answer and Counterclaim (#66).  Accordingly, on September 26, 2008, Horizon filed its First Amended Answer, Defenses and Counterclaim (#100).  Horizon added, as a defense, an allegation that the "claims of the '128 patent are unenforceable due to inequitable conduct by the inventor(s), the assignee, the prosecuting attorney(s) and/or some combination of them and others substantively involved in prosecution of the application leading to the '128 patent" before the PTO.  Horizon alleged that, but for Ripmax's intentional omissions of information, the PTO would never have issued the '128 patent.  Horizon also added a Counterclaim for Declaratory Judgment seeking a declaration that the '128 patent is unenforceable due to Ripmax's inequitable conduct.  On October 6, 2008, Ripmax filed a Reply to Horizon's First Amended Counterclaim (#105).  Ripmax denied Horizon's allegations that Ripmax engaged in inequitable conduct in prosecuting the '128 patent.

On October 7, 2008, this court entered an Opinion (#106) which granted, in part, and denied, in part, Horizon's Motion for Summary Judgment (#60).  This court carefully considered all of the arguments raised by the parties and all of the documents presented by the parties.  This court concluded that Horizon had shown that its products do not infringe the '128 patent, as properly construed, so that Horizon was entitled to summary judgment on the issue of infringement.  This court concluded, however, that genuine issues of material fact remained as to the issue of the validity of the '128 patent.

In the meantime, on September 29, 2008, Horizon filed, under seal, a Motion for Summary Judgment of Inequitable Conduct (#103), with attached exhibits.  On October 23, 2008, Ripmax

3

filed, under seal, its Response to Horizon's Motion for Summary Judgment of Inequitable Conduct and Cross Motion for Summary Judgment of No Inequitable Conduct (#109), with attached exhibits, and additional exhibits (#110), also filed under seal.  Horizon filed its Reply Memorandum in Support of its Motion for Summary Judgment and in Opposition to Plaintiff's Cross Motion for Summary Judgment (#112), under seal, on November 10, 2008.  Horizon was later allowed to file a corrected copy of Exhibit AC in support of its Reply (#115).

On January 23, 2009, the parties appeared before this court for a final pretrial conference. This court vacated the jury trial scheduled for February 2, 2009.  This court set the case for a final pretrial conference on May 15, 2009, at 1:30 p.m., and a jury trial on June 1, 2009.  The final pretrial conference was subsequently rescheduled to May 12, 2009, at 1:30 p.m.  Numerous pre-trial motions have been filed by the parties and are before the court for ruling.

ANALYSIS

I.  CROSS MOTIONS FOR SUMMARY JUDGMENT

ON ISSUE OF INEQUITABLE CONDUCT

A.  FACTS

The documents provided by the parties regarding the issue of inequitable conduct establish the following facts.  Elliot Wright worked for Ripmax for approximately 18 years until he left in March 2008.  In 2000, Wright disclosed to others his concept for a modified radio control system. At that time, Ripmax was owned by Clive Coote and Wright told Coote about the idea.  A decision was made to seek a patent on the idea.  On June 15, 2000, Wright sent a summary of his concept to David Weitzel, Ripmax's long time UK-based patent agent.  The summary included a statement that the "receiver will never accept a signal from another transmitter."  On August 1, 2000, Weitzel

4

prepared and filed a UK patent application based upon Wright's description.  The UK application disclosed a radio frequency transmitter and receiver directed to the remote operation of a model vehicle such as an airplane.  The alleged inventive features of the patented receiver included: (1) a receiver specific "identifying code" keyed to the transmitted control signals to prevent the transmitter from controlling other receivers; (2) a processor for assessing the selectively formatted control data; and (3) a scanning tuner set in the receiver to locate open channels.  In operation, the receiver scans the available frequency channels for a data transmission signal containing its unique code.  Upon a "match," the receiver stops scanning and locks onto the transmitter control signals containing that receiver's unique code.

On July 31, 2001, Weitzel followed the UK application with an international patent application known as a Patent Cooperative Treaty (PCT) application.  The PCT application allowed Ripmax to designate many different countries for later patent applications all stemming from this international case, including the United States.  Wright testified that they filed a PCT "to save costs and to sort of spread the costs out over a longer period."  During the prosecution of the PCT application, the European-based patent examiner located and identified to Ripmax two German patent references, DE 9319508 (DE '508) and DE 19502839 (DE '839).  The patent examiner listed these two references on an International Search Report (ISR) which was mailed on December 4, 2001.  Both of these references were marked with an "X" which meant "document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone."  The ISR included one other reference marked with an "X," United States patent 5,499,388 (the Song '388 patent).  An additional German patent reference, DE 19705502 (DE '502) was also listed and marked with an "A" which meant "document

defining the general state of the art which is not considered to be of particular relevance."

Wright testified that he received the ISR in 2001 and talked to Joe Schamuhn in Ripmax's German office.  Wright testified that he sent Schamuhn the information and eventually, around Christmas, he "finally got a rough translation back" from Schamuhn.  Wright testified that he thought Schamuhn "may have just read it out over the phone to me and formed his own opinion, passed on to me."  Wright testified that it was his recollection "that it turned out to be a device doing something totally different that was not relevant to our patent."  Wright testified that he would have reported back to Weitzel regarding what the content was and would have "discussed any implications" with Weitzel.  Weitzel testified that he does not speak German and that he did not recall getting translations for the German references listed in the ISR into an English form.  Colin Straus, who has worked at Ripmax since 1987, testified that he could not remember seeing the ISR or the German references.

Wright also testified that, regarding the Song '388 patent, it was his understanding that it was "describing a system that was the initial implementation of synthesized frequencies in radio control, and it is a way of tuning a receiver to a transmitter, so a way of the receiver finding the transmitter."  Wright testified that he did not believe that the Song '388 patent referred "to any form of unique code."

Wright testified that a decision was made that the references in the ISR were not relevant to their patent application and that "we would not have proceeded with the application if we felt it was going to get turned down."  Wright stated that he remembered going through the ISR with Weitzel and then he "was happy to carry on."

The PCT entered "national stage" in the United States on October 8, 2002, at which point

prosecution of the U.S. patent application (the '510 application) was undertaken before the PTO. In 2003, Coote sold Ripmax to Nicholas Moss, and the pending patent applications were all turned over to the new owner as part of the transaction. Ripmax decided to drop the prosecution of all pending patent applications stemming from the PCT application, except for the '510 application in the U.S. Wright testified that this decision was made "[b]ecause it was becoming very expensive and the technology had not been adopted by Futaba" as they had hoped. Futaba was a Japanese modeling company that Ripmax had a relationship with as a distributor of Futaba's products. Wright testified that Ripmax was not able to interest Futaba in this technology. Wright stated that the decision to drop the patent applications was made within the first year after Moss purchased Ripmax as a cost saving measure. Straus testified that the foreign applications related to the '510 application were dropped to save cost, but that the U.S. application was preserved because of the vast importance of the U.S. market.

On November 19, 2004, the U.S. Examiner issued an office action, fully rejecting all of the claims of the patent based on prior art, U.S. patent 5,896,094 to Narisada (Narisada patent), independently discovered by the Examiner. The Narisada patent related to a remote keyless entry system for a car that uses a radio transmitter and receiver to open a car door lock remotely. The Examiner pointed out that the Narisada patent disclosed a radio control receiver for operating a plurality of devices each on a respective device channel, the receiver having data storage containing code unique to the receiver. Weitzel prepared arguments regarding the Narisada patent and passed them along to Ripmax's U.S. patent attorney, Michael Epstein, in early 2005. On May 5, 2005, Epstein filed Ripmax's response to the PTO. The response canceled claim 1, amended or canceled other claims and included a new claim 23. The response also included arguments directed at

distinguishing the reference to the Narisada patent.  The response stated that Narisada "does not anticipate the claimed subject matter."  The response stated that "[n]ew claim 23, replacing claim 1, specifies, among other things, a radio control receiver for operating a plurality of devices in a model in accordance with respective control data each on a respective one of a plurality of device channels included within a radio channel."  The response stated that "Narisada discloses a radio control receiver but not for operating a plurality of devices in accordance with received control data."  The response also stated that "[c]laim 23 additionally specifies a [tuner] arranged to scan a plurality of radio channels" and that "[n]one of the embodiments disclosed in Narisada has such a [tuner]."  The response set forth other bases for distinguishing Narisada and stated:

> The invention is intended to meet the problems encountered by radio control modellers, caused by there being a limited number of channels available for control of their models: for example, around 80 in the UK.  Various mechanical systems are used to avoid use of the same channel by two separate transmitters.  Flying a channel-indicative pennant is one system.  Use of a peg-board is another.  The receiver is usually contained inside the model.  Commonly, the receiver is tuned by a replaceable crystal, different radio channels being selected by different crystals.  If a modeller finds that the channel to which the receiver of his model is set is already in use, s/he can either wait until the channel becomes available, or change the crystal in the receiver to select a channel which is not in use.  The latter is often a cumbersome task involving partial dismantling of the

8

model.

None of this is addressed by Narisada.  The reference is concerned with a keyless entry system.  In such systems, the channel is preset and cannot be altered in order to avoid repeated use of the same channel.  Indeed, plural use is permissible, transmissions on the same channel being distinguished by their ID code.  In the invention, reception by plural receivers on the same channel is not distinguished but avoided.  This difference is significant because in the keyless entry system described by Narisada, the transmitter button is pressed and the command signal illustrated in Figure 2 is sent, once.  Even if the command signal were repeated whilst the button remained pressed (there is no disclosure of that) the signal would cease when the button was released, say, when the lock operated.  This is in contrast to the model-application claimed, where the transmitter is switched on and continuously transmits control data in repeated frames, representing the current state (e.g. position) of an input device (e.g. joystick) from frame to frame.  In the keyless entry system the change of interference due to simultaneous transmissions on the same channel is low and the effect is inconsequential.  In the radio control model case the consequence of interference caused by simultaneous transmissions on the same channel is catastrophic.

The response also stated that "none of the remaining references cited, but not applied by the

Examiner, teaches the features missing from Narisada as explained above in relation to anticipation."

It is undisputed that Ripmax was aware of its disclosure obligation to the PTO during the prosecution of the '510 application.  It is also undisputed that Ripmax did not submit a single prior art reference to the U.S. Examiner during the prosecution of the '510 application.  Epstein testified that he did not request an English translation of the German references in the ISR and never saw an English translation of the German references.  Moss, who became the managing director of Ripmax in 2003, testified that he had never seen the ISR or the German references.

The U.S. Examiner accepted Ripmax's arguments and the '128 patent was issued on January 3, 2006.  Horizon has provided this court with the complete file history, certified by the PTO, related to the '510 application which became the '128 patent.  The file includes: a copy of DE '508, in German; a copy of DE '839, in German; a copy of DE '502, in German; and a copy of the ISR which listed those references.[1]  The file also includes a list of six U.S. patent references, including the Narisada patent.

## B. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v.

---

[1] Horizon has provided English translations of the German references.  There is no dispute that the translations provided to this court were prepared at Horizon's request and did not exist prior to this litigation.

Pekin Cmty. High Sch. Dist. 303, 213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  When this court considers cross motions for summary judgment, this court must review the record construing all inferences in favor of the party against whom the motion under consideration is made.  See Mote v. Aetna Life Ins. Co., 502 F.3d 601, 606 (7th Cir. 2007); see also Lawrence v. Life Ins. Co. of N. Am., 2007 WL 2410180, at *5 (N.D. Ill. 2007) (cross motions for summary judgment demand a "dual perspective").    "[S]ummary judgment must be granted when, drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and no reasonable jury could return a verdict for the non-movant."  Innogenetics, N.V. v. Abbott Labs., 512 F.3d 1363, 1378 (Fed. Cir. 2008).

## C.  INEQUITABLE CONDUCT

"To find a patent unenforceable for inequitable conduct, there must be clear and convincing evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the PTO."  Research Corp. Techs., Inc. v. Microsoft Corp., 536 F.3d 1247, 1252 (Fed. Cir. 2008). "Inequitable conduct is an offense against the PTO and the public" and "is committed most commonly by intentional failures to submit material references to an examiner, or by making knowing false or misleading statements to the examiner, such that it can confidently be said that by deceitful intent the patent prosecution process has been subverted."  Akron Polymer Container Corp. v. Exxel Container, Inc., 148 F.3d 1380, 1383 (Fed. Cir. 1998).  The issues of materiality and intent are fact-driven.  McKesson Info. Solutions, Inc. v. Bridge Med., Inc., 487 F.3d 897, 902 (Fed. Cir. 2007).  However, the Federal Circuit has "consistently treated inequitable conduct as an equitable defense that may be adjudicated by the trial court without a jury."  Agfa Corp. v. Creo Prods., Inc.,

451 F.3d 1366, 1375 (Fed. Cir. 2006).  "Inequitable conduct is an equitable defense to patent infringement most appropriately reserved for the court."  Rothman v. Target Corp., 556 F.3d 1310, 1322 (Fed. Cir. 2009).

"The first prong, *materiality*, is a required element of the inequitable conduct analysis."  Research Corp., 536 F.3d at 1252 (emphasis in original).  The materiality of information withheld during prosecution of a patent application may be judged by the "reasonable examiner" standard.  McKesson, 487 F.3d at 913, citing Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1316 (Fed. Cir. 2006).  The materiality of prior art turns on whether "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."  Rothman, 556 F.3d at 1323, quoting Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1297 (Fed. Cir. 2008)  The Federal Circuit has made clear that, under the reasonable examiner standard, "material prior art need not necessarily present a prima facie case of unpatentability."  Agfa Corp., 451 F.3d at 1373, citing Digital Control, 437 F.3d at 1315.  In 1992, 37 C.F.R. § 1.56 was revised to more clearly articulate the materiality standard.  Rothman, 556 F.3d at 1323.  Revised Rule 56 provides:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) [i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a position the applicant takes in: (i) [o]pposing an argument of unpatentability relied on by the Office, or (ii) [a]sserting an argument of patentability.

Rothman, 556 F.3d at 1323, quoting 37 C.F.R. § 1.56(b) (2008).

The second prong, intent to deceive, like intent evidence generally, often relies on evidence from surrounding circumstances. Rothman, 556 F.3d at 1323. However, that showing "must at all times reach a threshold of 'clear and convincing.'" Rothman, 556 F.3d at 1323, quoting Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1329 (Fed. Cir. 1998). Therefore, a mere showing that information was not disclosed is insufficient; rather, "there must be a factual basis for a finding of deceptive intent." See Rothman, 556 F.3d at 1323, quoting Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996). "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Rothman, 556 F.3d at 1323, quoting Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed. Cir. 1988). "This is a high bar." Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1360 (Fed. Cir. 2008). For instance, gross negligence is not sufficient to show deceptive intent. Rothman, 556 F.3d at 1323; Eisai Co., 533 F.3d at 1359-60; Baxter Int'l, Inc, 149 F.3d at 1329. "In a case involving an omission of a material reference to the PTO, there must be clear and convincing evidence that the applicant made a deliberate decision to withhold a known material reference." Baxter Int'l, Inc., 149 F.3d at 1329.

"The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." McKesson, 487 F.3d at 913, quoting Digital Control, 437 F.3d at 1313. "The court must then determine whether the questioned conduct amounts to inequitable conduct by balancing the levels of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the other.'" McKesson, 487 F.3d at 913, quoting Digital Control, 437 F.3d at 1313.

13

### D.  HORIZON'S MOTION FOR SUMMARY JUDGMENT

Horizon argued that it is entitled to summary judgment because the undisputed facts show that Ripmax committed inequitable conduct by intentionally withholding the translations of the German references and other material prior art in an effort to mislead the PTO.  Horizon has argued that the undisputed evidence demonstrates that: (1) Ripmax had full knowledge of the importance of the German language '839 patent; (2) Ripmax received an English translation of the '839 patent, but failed to disclose this to the U.S. Examiner; and (3) Ripmax expressed positions and presented arguments to the PTO that it could not have made had the undisclosed reference been revealed to the U.S. Examiner.  Horizon argued that the German references are highly material to the '128 patent.  Horizon contended that these references describe, among other things, a radio control system for remote operation and specifically teach a specific receiver's unique identifier, a receiving frequency scan operation to lock on to the correct transmitter frequency providing the control signals for that receiver, and operating a plurality of devices in a model on multiple device channels within one radio channel.  Horizon argued that, because these features are the supposed novelty of the '128 patent, information regarding prior art confirming these details is highly material to the patentability of the '128 patent.

Horizon argued, emphatically, that the German references disclose all of the features that Ripmax argued the Narisada patent lacked.  Horizon contended that, if English translations of the German references had been before the U.S. Examiner, Ripmax would not have been able to distinguish the prior art and the '128 patent would not have issued.  Horizon argued that "Ripmax had a motivation for suppressing any translation of the references or any discussion of them from the Examiner."

14

Horizon also argued that it has shown that Ripmax engaged in inequitable conduct because Ripmax did not disclose the '980 patent issued to Wright and the '221 Rosenhagen patent.  Horizon argued that Ripmax was aware of both of these patents and both would have prevented Ripmax from successfully distinguishing the Narisada patent.  Horizon's argument that Ripmax was aware of the '221 patent is based solely on the fact that the '221 patent was part of Epstein's file.

In its Response, Ripmax argued that Horizon provided no facts in support of its arguments that the various references relied upon meet the standards for "materiality."  Ripmax also argued that Horizon did not point to any credible evidence that Ripmax intended to deceive the PTO.  Ripmax argued that the record is clear that Ripmax did not try to hide any information relating to the German references and that it was Ripmax's actual belief that the German references were not relevant to the '510 application.  Ripmax pointed out that the ISR and the German references cited in the ISR were part of the '510 application file and were before the U.S. examiner.  Ripmax therefore argued that there was no evidence that Ripmax had any information about the German references that the U.S. Examiner did not also have.

Ripmax also argued that the other references pointed to by Horizon were cumulative with other more relevant references which were already before the Examiner.  Ripmax pointed out that the '980 patent discloses a system for stabilizing radio controlled aircraft using light sensors.  According to Ripmax, the '980 patent was not material to the '510 application because it is directed to a completely unrelated aspect of radio control and would have been cumulative to information already before the U.S. examiner, including the '388 Song patent.  Ripmax further argued that the '221 patent was cumulative of the '388 Song patent, the Narisada patent, and four other U.S. patents listed as having been reviewed by the U.S. examiner.  In addition, Ripmax argued that Horizon has

15

not shown that Ripmax or its attorneys even had any knowledge of the '221 patent while the '510 application was pending.  Defendant argued that the record supports an inference that Epstein received a copy of the '221 patent after the '128 patent was already issued because it is likely that the '221 patent was made a part of Epstein's file during his work on the infringement analysis in this case.  At his deposition, Epstein testified that he had no recollection as to why the '221 patent was in his file.  It is undisputed that Epstein performed work related to the '128 patent for Ripmax after the patent was issued on January 3, 2006.

In its Reply (#112), Horizon argued that Ripmax could not escape its obligation to submit the Schamuhn translations to the U.S. examiner by "refusing to put the translation in writing."  Horizon also argued that Ripmax's arguments in distinguishing the Narisada patent were a knowing and willful violation of its duty of candor.  Horizon argued that Ripmax has not disputed that it distinguished Narisada based upon features which were present in the prior art of which Ripmax was aware.

Following this court's careful review of the documents provided by the parties, this court agrees with Ripmax that Horizon has fallen far short of providing clear and convincing evidence of inequitable conduct on the part of Ripmax.  This court fully recognizes that Horizon is convinced that Ripmax engaged in unsavory and deceptive conduct and that the individuals deposed have attempted to cover Ripmax's tracks by conveniently not recalling many events regarding the prosecution of the '128 patent.[2]  However, Horizon has not provided this court with any evidence

---

[2]  Horizon has argued, stridently, that Ripmax has engaged in deceptive misconduct during the discovery process in this case and has relied, in part, on this alleged discovery misconduct as evidence of Ripmax's intent to deceive.  This court notes, however, that Magistrate Judge David G. Bernthal entered an Order (#144) on March 10, 2009, which denied Horizon's Motion for Sanctions and Attorney Fees based upon Ripmax's alleged misconduct.  Judge Bernthal concluded that Horizon had not met its burden of persuasion and stated that he

which would support an intent to deceive.  This court notes that Horizon has made arguments regarding the timing of certain events to support its arguments.  In particular, Horizon claims that Ripmax decided to pursue a U.S. patent after the U.S. Examiner issued its non-final action denying the patent based upon the Narisada patent.  Horizon argued that Ripmax made the decision to continue pursuing a U.S. patent because the U.S. Examiner missed the German language references which Ripmax knew would reduce its chance of getting a patent.  This court concludes that these arguments are entirely speculative and have no support in the record.  The record shows that the patent application entered national stage in the U.S. in 2002 and that the decision not to pursue patents in other countries was made in 2003, after Moss took over management of Ripmax and based upon cost considerations.  These decisions could not have been influenced by the U.S. Examiner's action in November 2004.

In finding that Horizon has not shown inequitable conduct regarding the German references, this court has accepted Horizon's argument that the German references, particularly DE '839, were material because Ripmax could not have distinguished the Narisada patent the way it did in light of the German references.[3]  As previously noted, however, this court concludes that Horizon has not shown an intent to deceive regarding the German references.

_____

would "not award sanctions on a hunch."

[3]  In accepting this argument, this court notes that it is not impressed by Horizon's argument that it has shown that DE '839 was material based on Wright's deposition testimony.  During his deposition, Wright was shown the English translation of DE '839.  He was then asked questions about it, which the questioner stated were "based on your brief reading of it today so far."  Wright testified that certain aspects of the radio and receiver disclosed by that patent seemed similar to the concept of the '128 patent.  Wright was then asked if  there was "anything that jumped out at [him] as being distinct from [his] concept in its operation" and answered, "[n]othing that is particularly different."  This court concludes that little weight can be given Wright's testimony which was acknowledged by the questioner to be based on a "brief reading" of the translation of a lengthy and complicated patent.

On this point, this court concludes that the facts Horizon insists are "undisputed" are not supported by the record. There is no evidence, other than speculation and unreasonable inference, that Ripmax had knowledge of the importance of the German language '839 patent. Wright testified that he received the ISR and sent information to Schamuhn for translation. Wright testified that he "finally got a rough translation back" from Schamuhn and testified that Schamuhn "may have just read it out over the phone to me and formed his own opinion, passed on to me." Wright testified that, after receiving Schamuhn's translation, it was his recollection "that it turned out to be a device doing something totally different that was not relevant to our patent."[4] Horizon has provided no contrary evidence to show that anyone else at Ripmax obtained information regarding the German patents and reached a different conclusion, that the German references were important prior art.

There is also no evidentiary support for Horizon's assertion that it is undisputed that Ripmax "received" an English translation of the '839 patent but failed to disclose this to the U.S. Examiner. Wright testified that Schamuhn provided him with a translation of the information provided in German, probably over the telephone, a translation which Wright believed showed that the German references were not relevant. The deposition transcripts provided to this court show that no one remembered receiving or seeing a written translation of the German references. The record further shows that copies of all three of the German references are part of the '510 application file and were, obviously, available to the U.S. Examiner. Horizon has therefore argued that the U.S. examiner "overlooked" these references, thereby creating an obligation for Ripmax to provide English translations for the German references.

---

[4] Wright's conclusion certainly may have been incorrect, but this court has no reason to disregard Wright's sworn deposition testimony regarding his belief.

Horizon relied on § 1893.03(g)[5] of the PTO's Manual of Patent Examining Procedure
(MPEP) which "requires the Examiner to note consideration of the ISR in the first office action,"
something not done regarding the '510 application.   The pertinent section of the MPEP provides:

> When all the requirements for a national stage application
> have been completed, applicant is notified (Form PCT/DO/EO/903)
> of the acceptance of the application under 35 U.S.C. 371, including
> an itemized list of the items received.  The itemized list includes an
> indication of whether a copy of the international search report and
> copies of the references cited therein are present in the national stage
> file.   The examiner will consider the documents cited in the
> international search report, without any further action by applicant
> under 37 CFR. 1.97 and 1.98, when both the international search
> report and copies of the documents are indicated to be present in the
> national stage file.  The examiner will note the consideration in the
> first Office action.  There is no requirement that the examiners list the
> documents on a PTO-892 form. . . . .   Otherwise, applicant must
> follow the procedure set forth in 37 CFR 1.97 and 1.98 in order to
> ensure that the examiner considers the documents cited in the
> international search report.

MPEP § 1893.03(g).  Section 1.98 of the Code of Federal Regulations (C.F.R.) states that the

---

[5] Horizon's first argument on this point mistakenly cited to "MPEP § 1893.03(a)," which
does not say that at all.

information the applicant provides should include a "copy of the translation if a written English-language translation of a non-English-language document, or portion thereof, is within the possession, custody, or control of, or is readily available to any individual designated in § 1.56(c)." 35 C.F.R. § 1.98(a)(3)(ii).[6]

Horizon has not provided any evidence that anyone involved in Ripmax's prosecution of the '128 patent was in possession of an English translation of the German references cited in the ISR. This court concludes, therefore, that Horizon has not shown that Ripmax had an obligation to provide translations which did not exist.  See Rothman, 556 F.3d at 1327 (the patent holder could not be charged with "culpable intent in withholding information that [it] did not have" (citation omitted)); see also Williams Advanced Materials, Inc. v. Target, 2004 WL 1811397, at *18 (W.D. N.Y. 2004) (court did not agree that the applicant's failure to translate a portion of the reference provided evidence of his intent to mislead the PTO); Softview Computer Prods. Corp. v. Haworth, Inc., 2000 WL 351411, at *8 (S.D.N.Y. 2000) (court found that the evidence showed that a translation of foreign patent was not readily available so the failure to submit a translation did not, by itself, constitute evidence of fraudulent intent).  Further, Horizon has not presented any evidence to show that anyone involved in Ripmax's prosecution of the '128 patent believed that the German references were relevant to the prosecution of the '128 patent.  Wright testified that he did not believe that the German references were relevant to the prosecution of the '128 patent and no one else testified regarding any knowledge of the German references.

_____

[6] The individuals designated in 37 C.F.R. § 1.56(c) are: "(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application."

In <u>Rothman</u>, the Federal Circuit reversed a jury verdict finding inequitable conduct.  The court concluded that the record contained no substantial evidence of intent to deceive or evidence that the patent holder affirmatively misrepresented material facts during the prosecution of the patent.  <u>Rothman</u>, 556 F.3d at 1329.  The court specifically noted that a "prosecuting attorney is free to present argument in favor of patentability without fear of committing inequitable conduct."  <u>Rothman</u>, 556 F.3d at 1328-29.  The Federal Circuit's precedent is clear that an applicant is free to advocate its interpretation of its claims and the teachings of prior art.  <u>Innogenetics</u>, 512 F.3d at 1379.

This court notes that, in cases where inequitable conduct was found to have occurred, there was strong evidence of intentional, misleading conduct not present here.  <u>See</u> <u>McKesson</u>, 487 F.3d at 924 (court upheld finding of inequitable conduct where the applicant did not inform the examiner of one patent application of adverse decisions by another examiner regarding a closely-related patent application and made statements to the examiner inconsistent with the other examiner's decisions); <u>Agfa Corp.</u>, 451 F.3d at 1377-80 (court upheld finding of inequitable conduct where evidence supported a finding that the patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability argument to the PTO, noting that there was overwhelming evidence that the patentee had knowledge of material prior art and further noting that the evidence showed that the patentee's agents "prepared and prosecuted the asserted patents, never sharing with the PTO any of the information they had compiled about the products upon which they modeled their system");  <u>Ferring B.V. v. Barr Labs., Inc.</u>, 437 F.3d 1181, 1191-92 (Fed. Cir. 2006) (court upheld district court's grant of summary judgment on issue of inequitable conduct where the applicant failed to disclose "significant past relationships" with scientists who submitted supporting

declarations to the patent examiner); <u>Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.</u>, 204 F.3d 1368, 1378 (Fed. Cir. 2000) (court found district court did not abuse its discretion in finding inequitable conduct where patent applicant provided a misleadingly incomplete, partial translation of a material reference and a narrow and incomplete concise statement; court noted that the "duty of candor does not require that the applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching"); <u>Baxter Int'l, Inc.</u>, 149 F.3d at 1329 (district court finding of inequitable conduct upheld where the documentary evidence was clear that the  device not disclosed to the PTO formed the basis of the claimed inventions and that the inventors were clearly acquainted with the critical features of the undisclosed device); <u>Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.</u>, 984 F.2d 1182, 1191 (Fed. Cir. 1993) (inequitable conduct properly found on summary judgment where evidence showed patentee submitted deceptive and possibly false affidavits to the patent examiner, noting that intent to mislead was shown "not simply from the materiality of the affidavits, but from the affirmative acts of submitting them, their misleading character, and the inability of the examiner to investigate the facts").

This court notes that "intent to mislead may not be inferred, without more, from the failure to disclose to the patent examiner known, highly material information."  <u>Judkins v. HT Window Fashion Corp.</u>, 529 F.3d 1334, 1343 (Fed. Cir. 2008), <u>citing</u> <u>Paragon</u>, 984 F.2d at 1191.  This court concludes that the lack of clear and convincing evidence of intent to deceive imposes an insurmountable bar to finding inequitable conduct in this case.  <u>See</u> <u>Eisai Co.</u>, 533 F.3d at 1361 (affirming district court's finding of no inequitable conduct).  A threshold level of deceitful intent has not been shown.  <u>See</u> <u>Akron Polymer</u>, 148 F.3d at 1384.

This court also finds that Horizon has not shown, by clear and convincing evidence, that inequitable conduct occurred regarding the non-disclosure of the '980 patent and the '221 patent. Horizon argued that the '980 patent, obtained by Wright for a previous invention, disclosed features claimed in the '128 patent and that, obviously, Wright and Weitzel were aware of the '980 patent. The '980 patent discloses a system for stabilizing radio controlled aircraft using light sensors. While there are some features in common between the invention disclosed by the '980 patent and the '128 patent, this court agrees with Ripmax that a reasonable examiner would not have considered the disclosure of the '980 patent important to his decision whether to grant or deny the '510 application.

Following this court's careful consideration of all the evidence presented in this case, this court also agrees with Ripmax that the disclosure of the '980 patent which may be tangentially related to the subject matter of the '128 patent is cumulative to the disclosure of Song '388, a reference that was already before the U.S. Examiner. Information is material to patentability "when it is not cumulative to information already of record." 37 C.F.R. § 1.56(b) (2008). Therefore, an applicant for a patent is under no obligation to disclose material references that are cumulative to information that is already before the Examiner. Halliburton Co. v. Schlumberger Tech. Corp., 925 F.2d 1435, 1440 (Fed. Cir. 1991). This court further agrees with Ripmax that Horizon has not provided any evidence to support a finding that Ripmax withheld the '980 patent with the belief that it was hiding material information from the Examiner. "Inequitable conduct requires not intent to withhold, but rather intent to deceive." Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1327 (Fed. Cir. 2009), quoting Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1367 (Fed. Cir. 2003). This court concludes that intent to deceive cannot be inferred in this situation because the evidence shows that Ripmax believed that the '980 patent, directed toward

model stabilization, is unrelated to the claims of the '128 patent.

As far as the '221 patent, Horizon argued that it describes many aspects of operating a model in accordance with the claims of the '128 patent, including multiple device channels and the use of receiver unique codes.  Horizon pointed out that Ripmax produced the '221 patent during discovery and identified it as coming from the files of Epstein.  Horizon argued that it "is likely that this document was uncovered by David Weitzel during a prior art search on Mr. Wright's concept and shared with Mr. Epstein."  Following this court's careful review of all of the documentation provided in this case, this court agrees with Ripmax that the elements of the '221 patent Horizon relied on to argue the materiality of the '221 patent were already disclosed in references that were before the Examiner so that the '221 patent was cumulative to references already before the Examiner.  In addition, this court concludes that Horizon has produced no evidence to support its conjecture regarding the knowledge of Epstein and Weitzel concerning the '221 patent.  Consequently, this court concludes that Horizon has not provided evidence of any intent to deceive regarding the '221 patent.

Based upon all the evidence before this court, this court concludes that Horizon has failed to show, by clear and convincing evidence, that the '221 patent was material, and not cumulative, to the prosecution of the '128 patent, or that Ripmax did not disclose the '221 patent with the intent to deceive.

For all of the reasons stated, this court concludes that Horizon has not shown that it is entitled to summary judgment as to its claim that the '128 patent is unenforceable because of inequitable conduct on the part of Ripmax.  Accordingly, Horizon's Motion for Summary Judgment (#103) is DENIED.

E.  RIPMAX'S CROSS MOTION FOR SUMMARY JUDGMENT

On October 23, 2008, Ripmax filed its Cross Motion for Summary Judgment of No Inequitable Conduct (#109).  Horizon has argued that Ripmax's Cross Motion for Summary Judgment is untimely and should not be considered by this court.  Horizon points out that the Discovery Order (#48) entered on September 12, 2007, set a deadline of September 29, 2008, for the filing of dispositive motions.  This argument would be compelling except for the fact that Horizon was allowed to file its amended counterclaim alleging inequitable conduct on September 26, 2008, more than one year after the September 18, 2007, deadline for amending pleadings set out in the Discovery Order.  Considering that Horizon was allowed to file its amended counterclaim more than one year late, this court concludes that it is only reasonable and fair to allow Ripmax to file a Motion for Summary Judgment on that claim less than one month after the claim was filed, even though it was approximately 3 ½ weeks after the deadline for filing dispositive motions set out in the Discovery Order.

This court further concludes that Ripmax's Motion should be granted.  Summary judgment may properly be granted in favor of the party accused of inequitable conduct if the accusing party fails to adduce sufficient evidence to require a trial on the issue of inequitable conduct.  See Innogenetics, 512 F.3d at 1368, 1379 (Fed. Cir. 2008); see also Eisai Co., 533 F.3d at 1362.  "The primary purpose of summary judgment is to isolate and dispose of factually unsupported claims."  Winters v. Fru-Con, Inc., 498 F.3d 734,  744 (7th Cir. 2007), quoting Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001).  As discussed previously, Horizon has relied on speculation regarding Ripmax's motives and intent.  Because summary judgment is the "put up or shut up" moment in the lawsuit, a mere "hunch about the defendant's motives" is insufficient to survive at

this stage.  See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008); see also Argyropoulos v. City of Alton, 539 F.3d 724, 737 (7th Cir. 2008).  Construing all inferences in favor of Horizon, this court concludes that Horizon has failed to provide evidence sufficient to meet its burden of proving inequitable conduct by clear and convincing evidence and Ripmax is entitled to summary judgment on this claim.

For all of the reasons stated, Ripmax's Cross Motion for Summary Judgment of No Inequitable Conduct (#109) is GRANTED.

## II.  PRE-TRIAL MOTIONS

### A.  MOTION IN LIMINE TO ALTER ORDER OF PROOFS

On December 30, 2008, Horizon filed a Motion in Limine to Alter Order of Proofs (#123). Horizon argued that its counterclaims of invalidity and inequitable conduct were the only remaining claims in this case.  Horizon argued that, because it has the burden of proof on both of these claims, it should go first at trial.  Horizon also argued that it should be referred to as "plaintiff" at trial in order to avoid confusion.

On January 9, 2009, Ripmax filed its Response (#128) to this Motion.  Ripmax agreed that, if the trial involves only the issues of invalidity and inequitable conduct, Horizon should put on its case, Ripmax should put on its defense of the patent, followed by rebuttal testimony for both Horizon and Ripmax.  Ripmax, however, opposed Horizon's request that it be referred to as "plaintiff" at trial.  Ripmax argued that this change in designation at this stage of the proceedings would be inconsistent with the record to date and would create significant confusion.

At this point, based upon the fact that this court is granting Ripmax's Cross Motion for Summary Judgment on the issue of inequitable conduct, the only issue remaining for trial is

Horizon's counterclaim of invalidity.  This court agrees with the parties that Horizon should proceed

first at trial regarding this claim.  In addition, this court agrees with Horizon that, to avoid confusing

the jury, Horizon should be referred to as "plaintiff" during the trial.  Accordingly, Horizon's Motion

in Limine to Alter Order of Proofs (#123) is GRANTED.

## B.  MOTION IN LIMINE TO PRECLUDE EVIDENCE

On December 30, 2008, Horizon filed a Motion in Limine to Preclude Evidence of

Infringement, Damages, and Secondary Considerations of Nonobviousness Based on Horizon's

Products (#124).  Horizon argued that, through its summary judgment ruling (#106), this court

entered judgment in favor of Horizon on Ripmax's Complaint (#1) alleging infringement.  Horizon

argued that this ruling precludes any possibility of infringement liability and, of course, damages,

rendering evidence on these issues totally irrelevant.  Horizon further argued that, given that this

court has ruled that Horizon's products do not infringe the '128 patent, the "success" of Horizon's

products is completely irrelevant to the issues to be presented at trial.

On January 9, 2009, Ripmax filed its Opposition to Horizon's Motion (#129).  Ripmax stated

that it disagrees with this court's ruling regarding infringement but "has no plans to present issues

with respect to literal infringement in view of the Opinion."  However, Ripmax argued that it should

be allowed to present evidence regarding infringement under the doctrine of equivalents with respect

to its infringement claims.  Ripmax argued that it did not waive this issue by not raising it in

response to Horizon's Motion for Summary Judgment because Horizon's motion did not discuss the

doctrine of equivalents.

As Ripmax has noted, this court already ruled on this issue in its Opinion (#119) denying

Ripmax's Motion for Clarification.  In the Opinion (#119), this court agreed with Horizon that

Ripmax did not present the doctrine of equivalents theory to the court in response to Horizon's Motion for Summary Judgment and waived the argument. Ripmax now argues that the cases cited by this court are distinguishable and that this court should not have found the issue waived. Ripmax noted that, after Horizon's Motion for Summary Judgment was filed, it supplemented its Interrogatory Responses to provide contentions regarding infringement under the doctrine of equivalents.[7] Ripmax argued that it has not waived its doctrine of equivalents claim and would like to have the opportunity to present its doctrine of equivalents infringement and damages case at trial. This court does not agree with Ripmax's argument.

Horizon filed a Motion for Summary Judgment (#60) and argued, in part, that it was entitled to summary judgment on Ripmax's Complaint alleging infringement of the '128 patent.[8] When a motion for summary judgment is filed, the party "who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007), citing Celotex Corp., 477 U.S. at 324. Therefore, to avoid summary judgment on the issue of infringement, Ripmax was required to provide factual support for any argument it had that Horizon's products infringed the '128 patent. This would include any claim it had that the products infringed the '128 patent based upon the doctrine of equivalents. Ripmax made no such argument. As the Seventh Circuit has often observed, "summary judgment

---

[7] Ripmax attached documents setting out its responses to Interrogatories. This court notes that Ripmax's supplemental response, dated March 6, 2008, stated that "at the present time and according to its present understanding, the doctrine of equivalents is not relevant to the present lawsuit."

[8] Horizon did not argue that its products did not infringe Ripmax's patent under the doctrine of equivalents because Ripmax had clearly stated that the doctrine of equivalents was not relevant to the present lawsuit.

is the 'put up or shut up' moment in the life of a case."  <u>AA Sales & Assocs., Inc. v. Coni-Seal, Inc.</u>,

550 F.3d 605, 612 (7th Cir. 2008), <u>quoting</u> <u>Johnson v. Cambridge Indus., Inc.</u>, 325 F.3d 892, 901 (7th

Cir. 2003).  Ripmax failed to argue that Horizon's products infringed the '128 patent based upon the

doctrine of equivalents and summary judgment was entered in Horizon's favor as to the issue of

infringement.  The issue of infringement has been decided and Ripmax cannot present evidence or

argument on that issue at trial.

In its Opposition to Horizon's Motion (#129), Ripmax also argued that, even if this court

precludes trial on the issue of the doctrine of equivalents and/or literal infringement, some evidence

regarding Horizon's products is admissible and relevant to inform the jury as to the nature of

Horizon's business and the marketing of its products and the technical details of Horizon's products.

Ripmax has not provided any explanation regarding how any of this evidence would be relevant to

a trial on the issue of the invalidity of the '128 patent.  This court agrees with Horizon that evidence

regarding its products is not relevant to the issue of invalidity.

For all of the reasons stated, Horizon's Motion in Limine (#124) is GRANTED.

### C.  MOTION IN LIMINE PRECLUDING USE OF FUTABA MANUALS

On December 30, 2008, Ripmax filed a Motion in Limine Precluding Use of the Futaba

Drivelink Manuals as Prior Art to the '128 Patent (#127).  Ripmax argued that this evidence should

be barred because Horizon has not provided any testimony or other evidence establishing the dates

of publication of these exhibits.  Ripmax contended that, in the absence of any foundational

testimony to authenticate their publication dates, Horizon cannot show that the exhibits were

published prior to July 31, 2000.  Ripmax argued that this evidence therefore should not be

submitted to the jury as "prior art."

On January 16, 2009, Horizon filed its Opposition to Ripmax's Motion in Limine (#133). Horizon stated that, for purposes of this motion, it agrees that any "prior art" must be dated before August 1, 2000, the date of Ripmax's initial patent application. Horizon argued, however, that not all of the exhibits are being introduced by Horizon as prior art. Horizon stated that some of the exhibits are, instead, being introduced as background to the technology and radio control industry. Horizon also argued that, contrary to Ripmax's arguments, the other exhibits have established dates of existence supported by the sworn testimony of Futaba.

Horizon has supplied a detailed explanation regarding the exhibits and their relevance to the trial in this case. This court concludes that Horizon has adequately shown that the challenged exhibits are relevant and admissible in this case. Accordingly, Ripmax's Motion in Limine (#127) is DENIED.

### D.  MOTION IN LIMINE TO EXCLUDE TRIAL EXHIBITS 578 AND 648

On March 2, 2009, Ripmax filed a Motion in Limine to Exclude Trial Exhibits 578 and 648 From the Jury (#140). Ripmax argued that the documents are not relevant to any issues to be presented to the jury at trial and are potentially prejudicial in that they provide a one-sided view of the discovery process. On March 16, 2009, Horizon filed its Opposition to Ripmax's Motion in Limine (#148). Horizon argues that the challenged exhibits are relevant and non-prejudicial.[9]

This court has carefully considered the challenged exhibits and the parties' arguments. This court concludes that both documents have very little, if any, relevance to the trial on the sole remaining issue of the invalidity of the '128 patent. This court further concludes, without hesitation,

---

[9]  This court notes that it does not agree with Horizon's description of TX 578. This court does not agree that the exhibit shows that Ripmax questioned Wright's credibility. A fair reading of the document shows that Ripmax questioned Horizon's characterization of Wright's testimony.

that any remote relevance the exhibits may have is far outweighed by the potential for unfair

prejudice.  Ripmax's Motion in Limine (#140) is GRANTED.

### E.  MOTIONS RELATED TO ISSUE OF INEQUITABLE CONDUCT

On December 30, 2008, Ripmax filed a Motion in Limine Precluding Horizon's Use of

Translations to Prove Inequitable Conduct (#126).  Ripmax sought an order from this court

precluding Horizon from using the English translations prepared by Horizon in the course of this

litigation, in February and April 2008, to prove inequitable conduct in connection with the

prosecution of the '128 patent or to attribute knowledge of the content of the German patents to

Ripmax.  Ripmax argued that the record is clear that the translations of the German patents were not

created until years after the issuance of the '128 patent.

On March 2, 2009, Ripmax filed a Motion to Preclude Testimony by Thomas Fuja, Ph.D,

Regarding Patent Prosecution Practice and Patent Office Procedure (#141).  Ripmax argued that Dr.

Fuja is not qualified as an expert on these matters since he lacks the requisite knowledge, skill,

experience, training and education in this specialized field.  Ripmax argued that Dr. Fuja's testimony

should not be allowed regarding the issue of inequitable conduct.  Also on March 2, 2009, Ripmax

filed a Motion for Bench Trial on Issues of Unenforceability and Inequitable Conduct (#142).

Ripmax argued that the issue of inequitable conduct should be decided by the court and not by the

jury.

On March 2, 2009, Horizon filed a Motion and Memorandum seeking leave to amend the

scheduling order (#143).  Horizon asked this court to allow it to amend the scheduling order to allow

it to have Richard Killworth, a noted expert in patent law and practice, testify at trial.  Horizon

argued that Killworth's testimony would offer testimony to the jury which would be useful on the

issue of whether Ripmax committed inequitable conduct.

This court has concluded that Horizon did not present this court with adequate evidence to show, by clear and convincing evidence, that Ripmax engaged in inequitable conduct so that Ripmax is entitled to summary judgment on this issue. Therefore, all of these motions (#126, #141, #142, #143) related to the issue of inequitable conduct are now MOOT.

IT IS THEREFORE ORDERED THAT:

(1) Horizon's Motion for Summary Judgment of Inequitable Conduct (#103) is DENIED.

(2) Ripmax's Cross Motion for Summary Judgment of No Inequitable Conduct (#109) is GRANTED. Judgment is entered in favor of Ripmax and against Horizon on Horizon's First Amended Counterclaim (#100) as to Horizon's claim of inequitable conduct.

(3) Horizon's Motion in Limine to Alter Order of Proofs (#123) is GRANTED.

(4) Horizon's Motion in Limine to Preclude Evidence of Infringement, Damages, and Secondary Considerations of Nonobviousness based on Defendant's Products (#124) is GRANTED.

(5) Ripmax's Motion in Limine Precluding Defendant's Use of Translations to Prove Inequitable Conduct (#126) is MOOT.

(6) Ripmax's Motion in Limine Precluding Use of the Futaba Drivelink Manuals as Prior Art to the '128 Patent (#127) is DENIED.

(7) Ripmax's Motion in Limine to Exclude Trial Exhibits 578 and 648 from the Jury (#140) is GRANTED.

(8) Ripmax's Motion to Preclude Testimony by Thomas Fuja, Ph.D. Regarding Patent Prosecution Practice and Patent Office Procedure (#141) is MOOT.

(9) Ripmax's Motion in Limine for Bench Trial on Issues of Unenforceability and

Inequitable Conduct (#142) is MOOT.

 (10) Horizon's Motion for Leave to Amend the Scheduling Order (#143) is MOOT.

 (11) Horizon's Second Motion for Summary Judgment of Non-infringement (#101) remains pending.

 (12) This case remains scheduled for a final pretrial conference on May 12, 2009, at 1:30 p.m. and a jury trial on June 1, 2009, at 9:00 a.m. solely on the issue of the invalidity of the '128 patent.

ENTERED this 11th day of May, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE
